case today, the United States versus Hall. Uh, Mr Gillison. Be pleased to hear from you, sir. Good morning. My name is Edward Gillison and I represent Joseph Hall and your honors today were faced with several issues. May please the court. I'd like to address them. I found a pretty extensive brief in this matter. The brief contains seven assignments of error that we believe occurred at the district court level. There are some of you didn't preserve in the district court, your honor. So they got a plain error issue on some of them, don't you? That is correct, your honor. And I think that if the court would allow me that perhaps I would start with those issues because I believe that if the court can understand what the basis of that is, the court could probably understand why they were not able to be preserved at the district court level. I know that the court has already read the briefs and understands the basis of what the case was about. So I'm not going to go into that. But one area that I really would like to touch on is the issue with regards to the ammunition purchase evidence that was deemed to be intrinsic evidence also found to be 404 B evidence. And it was also evidence that was not disclosed to me prior to trial. So that I wasn't able to do anything. And I have three issues that are associated with that. The first issue associated with that, your honor, is the in court testimony of Miranda quarter. Miss Cordery was the lady who was responsible for actually giving the sale or completing the sale of the guns. He was a clerk. That's correct. And you say you you didn't know they were going to introduce this evidence, your honor. I thought they offered it is 404 B. They did. But what was it? Did they offer? Didn't they tell you before trial? They're going to present 404 B evidence. They did, your honor. But the judge said it's not 404 B evidence. It's intrinsic. Well, you're part of the whole deal. Well, your honor, he said that it's both intrinsic evidence. And if it's not intrinsic evidence, then it would satisfy the 404 B. It's a display way looked at. Yes, sir. So whichever way we looked at it, the judge was going to let the evidence in. But you're saying you didn't know it was coming. That's what that's what kind of surprised me here, sirs. What I'm trying to say or serves a man. What I'm trying to say to you is, is that I knew that it was coming, but I did not know that the person who was going to give the evidence was not able to positively identify my client out of court as being the person who was actually involved. Talk about the identity evidence rather than the ammunition evidence. That's the same thing. It was the same thing. The identity evidence was based upon the government calling. The identity evidence was was whether he was the guy that was in the store with the with the purchaser. That's correct. To a certain extent, your honor, the evidence that I'm worried about with the identification was that when Miss Cordery testified in the court that the first thing that she mentioned was the ammo purchase evidence with regards to my client being president present with her. What I'm trying to say is that the record shows in this case that Miss Cordery was the person who completed the sale. The sale of a gun at Cabela's requires that the sales clerk who sells the gun escorts the person who purchased the gun out of the store. The government presented that testimony at trial and in it she implicitly or explicitly identified my client as being the person who was actually involved with asking for ammo for the was there really an issue about the identity? Uh, I thought the there was the, uh, the lady, the co conspirator or the upfront purchaser, the straw purchaser, whatever you call it, uh, identified your man to. Yes, she did. And that that's correct. She did identify my man. But for the issue of your man, your man admitted he was there too. He did, your honor. He admitted that he was. I don't I'm not following this argument at all. Are you, are you, if the identification testimony is fine, that you don't have any argument about the ammunition? I do, your honor. I believe that. What is it? Okay. I believe that the ammunition don't talk about the identification unless it's necessary. What's the problem with ammunition evidence? The problem with that is your honor that the purpose for which the government is searched or argue that that evidence was relevant to the matter below was never. I never had the opportunity to object to his introduction based upon the fact that all right, but are you now you're objecting to it? Tell us why it's not. You spent this whole argument talking about what's playing error review rather than preserved error. What's the error? You're in front of us. That's correct. What's the error on the ammunition? The error on the ammunition is that it was inappropriate for for the evidence that it was not reliable. But the judge said it was intrinsic. He did. Even if it was intrinsic, it was part of the transaction. They were in there to buy the guns and they walked out of the store. They bought some ammunition. Correct. But that fit the guns, two types of ammunition. That's correct. But what my problem is with the purchase ammunition or with the ammunition purchases that all of that happened after the purchase of the gun was done and the government couldn't find any case and nor can I visit to the store. That is correct, your honor. But I believe what the case law provides is that if something is supposed to be so intertwined with the actual criminal act in and of itself that it has to be a necessary preliminary. Well, you just told us that Cabela's considers that part of the gun transaction walking the purchaser out of the store. It is part of the same deal. I mean, they walk them out of there because they want to they want to. They can't go out of there with a gun and ammunition or it can't be in the store with gun and ammunition. They don't want that is correct, your honor. But the sale is basically completed at the point in which the sales clerk walks out of the store. Everything's done. But before they walked out of the store, they bought the ammunition. That is correct. So the ammunition, according to Judge Stamp, was intrinsic. It was part of the deal. I disagree respectfully. You disagree. So we review that even if it was preserved, we'd review it for abuse of discretion. That is that is correct. So here you're saying it's it's plain error. So we got it soup that superimposed on it because Judge Shed Judge Stamp never had the opportunity. Judge Stamp was never given the opportunity to assess your position on that. Never. And the reason being was because the government did not fulfill its duty. I don't know. Brady versus Maryland to give me the prerequisite information that I need. What is it they didn't give you? They did not give me the information that the person who was going to be testifying about my client being the person who initiated the ammo purchase could not identify my client before. That's the identity. You're back to the identity information. That's how it's all linked in together. But you said the identity thing is what? There's no question about his identity. Identity to being in the store. Identity to being in the store. We do not refute that. But the identity of being the actual purchaser of the gun and the purchaser of the ammo, we refute that. All right. But you're what you're talking about. They're talking about the one photo show up. Correct. Single photo show up. And did you? You didn't know about that until the trial until the sentencing hearing. I knew about till the sentencing hearing. But did you ever see the picture? I didn't ever see the picture. Did you? Did you get the jinx act material? I did not get the jinx act material. There was a jinx act order entered. That is correct. You two weeks before trial. I did not receive. And there was a net order said give you exculpatory information to two weeks before the trial. I did not receive that. And you cross examined about the identification. I did. And you cross examined about the photo show up. I did. Well, then why didn't you give it to trial? Because I did not have the information at trial. Well, you had to try. You were cross examining the witness. That's correct. At the trial about the very thing that you did say you didn't have. That's correct. So you must have been knew something about it. Or you just stumbled on it. That's right. No. What happened was while I was cross examining her, she then brought out the fact that I couldn't identify him. The picture was too grainy. Was her stumbled on. Yes, sir. Well, did you stop and say, your honor, I'd like to see what the records of this photo show up. I objected on the record. I approached the bench. We went up to the bed. Okay. And I objected to the identification testimony. Did they give you the picture then? Not they did not give me the picture. But what happened was the judge made a ruling. The judge ruled at that time that the identification was proper. And that's what he was proper. That's what he said. He's talking about the in court identification. Correct. All right. What did you ask him for the picture and for the for the jinx act material? I did not a statement of the witness. I did not. But you had made a motion for that before the trial. Well, in our district, your honor, that's something that's putting the initial scheduling rules and the rules, the local rules up there say you have to turn over jinx act material. That is correct to turn over exculpatory evidence. But and why don't they comply with those rules? We're gonna have your honor. I think that's what the major issue is. And I think that if my understanding of what occurred with regards to my brady argument that I made was that the agent who had interviewed Miss Quarterly had knowledge that she couldn't identify. But I don't know if he ever told that to the government. I know, but he's he's the agent of the government. He's a federal agent. He's not even one of these local policemen tapping them out. He's the A. T. F. Guy. I understand he writes this stuff up. Uh, I'm just wondering why you didn't follow up stronger on it. Your honor, I went with everything that I could do with the resources I had available. But if it is error, how it's anything other than harmless error. What? I believe that it goes way beyond harmless here. What would make it harmless arguably would be that you don't contest these identification. I mean, what would be would be impeaching of the uh, that she couldn't identify him with the picture could be 100% sure. She said she was 90% sure. Maybe it was a picture. Let me ask. Is that even? Is that exculpatory? I think it is. Why is it? It may not be. The picture is bad and I'm 90% sure that's that guy. That sounds inculpatory to me. Well, your honors, I think if we looked at this in context of everything that happened below with regards to the trial and with regards to the witness testimony, but she said, I'm 90% sure that's the guy. But that's a bad picture. That didn't sound exculpatory. Well, what she basically did your honor, she only identified him in court. And I believe that the due process clause requires a little bit more than that. She didn't qualify it in court. She said she identified him in court. Yes, but that was looking at him in court. That's correct. Well, there was no, no grainy photographs she had to look at. No, she didn't. Didn't he? Wasn't there testimony from the agent that she said I'm 90% sure that's the guy. But the photograph is grainy. I can't be 100% positive. I think there was something to be the agent testified that the trial at the sentencing hearing, right? I mean, but that none of this came in the trial. That's correct. They had already had the trial. That's correct. Okay, that's what the whole issue was. But tell me again why that why is that exculpatory? Your honors, I think that if I would have had the ability to first of all know that there was an issue with regards to the identification in the beginning that the preliminaries with regards to no, no way to say that's just if you're saying if you had some idea there was some issue. The fact is, if you had some idea there might be some issue that doesn't make it exculpatory. What makes it exculpatory is that even if even if the even if we say that there is no issue with regards to the identity of my client being in the store, if the jury would not have heard the purchase of the ammo evidence, this is my position, but it has nothing to do with the identification and whether or not her failure to be a hunt. My question is, why is her failure under those circumstances to be 100% positive over a grainy photograph? But 90% positive. Why is that exculpatory that it draws into effect the Brady room? Because I think it it raises the issue and I think what it really I think you're stretching it to try to get to Brady because you had an order that they have to turn over a jinx act material. Correct. Two weeks before the trial and the ATF man had written it up. That's correct. And that's a jinx act statement by him. Why didn't you get that? I mean it's a jinx act violation. Everything. But it's a you should have had it but it's a jinx act violation and the local rules of affairs say they're supposed to turn over that. They say they're also also supposed to turn over Brady material. So if it's a jinx act, this here arguably got both of them. You got, but you definitely have the jinx act. That's correct. I think what happened, but I don't see where it's anything other than harmlessness. That's what I can get at. You're gonna have to show me how you're possibly prejudiced by any of them. Your I mean whenever you have. Cor, our precedent is that it's a kind of an inclusive. I agree with that. We call it an inclusive rule. It comes in. I agree with you. But you still have law. It comes in. You still have law. It has to be followed with regards to the element. And the judge, Judge Stamps characterization of it is intrinsic. It's part of the whole deal. It would be hard to say it's not part of the whole deal. But I think what happened, that makes sense to part of it. He's in the store to buy the gun and he buys while he's in the store, he gets the he gets the to a front person. He bought the guns and then and then on the way out the story, bought some ammunition to use with the gun. I agree with and I agree with that assessment of it. But what the problem is with that is that if you think that your then what do you think the jury thought and what the jury thought is what's going to look in this jury thought we have to look at the you went to trial in this and we'd look at that in the light most favorable to the prosecution. You can say you thought he was guilty. Yeah, I agree with that. Guilty of that count. We did win the first one. The first count. Well, he's guilty. The only one who went on appeals that second count and what he's guilty of that. They found him not guilty of aiding and abetting the false statement. It's correct. Can I ask you Oh, sure. We've bounced around a lot. You've reserved some time. We've thought of, I thought of your argument based on questions I had. Would you just take a minute or two? Maybe a minute. What do you think your strongest asserted error is? What do you think? What do you think the strongest argument of error is? Which issue? Okay. First of all, I think that the strongest argument we have is the argument that I made about the 404 B. Evidence and whether or not it was 404 B. Evidence. Okay, I think that's my strongest argument. Thank you. However, and you had a chance to make that. I just want to be sure we talked about your strongest. We have time on rebuttal. Thank you very much. Thank you very much. Thank you, Mr Gill. Thank you very much, Mr Perry. You were the trial attorney as well. Both of you all actually tried this case. As I recall, that's correct. Your honor. May it please the court. My name is David Perry. I'm an A. U. S. A. In Northern District of West Virginia and I was trial counsel in this matter. Your honors, the uh what happened here with respect to the witness is that during the initial like the witness store clerk. Yes. Miranda Cordray. When she was perhaps not as thorough as it could have been. So it was actually during the trial preparation process that it was discovered that there had been a subsequent transaction involving ammunition. And it was during this subsequent interview during the trial preparation process that she was shown the photograph. So it wasn't a question of whether or not the agent had made a report of interview of it. There was no James. He right up the showing write a report on shoulder of the photograph. He did not, your honor. So there was no you're saying he didn't, he didn't even write that down. He didn't write it up. So and there's no Jenks issue. The defendant hasn't raised the Jenks issue. Jenks issue would only apply to a recorded statement anyway. What did he do after he showed her the photo? He didn't make any notes. Well, it was if he made notes, that would be Jake's material. He didn't make any notes. He the way it happened on the front of the photo. Essentially, it was an inconclusive identity. Didn't write anything down. I've never heard of a federal agent doing to on a lineup, a photo lineup. Well, here, this instance, 11 photo. That's a photo lineup. Uh, and not writing something down. I think what he was thinking is, well, now I know that there was this additional transaction in which Miss Quartery personally interacted with this guy. You know, maybe she could identify him and and it turns out she did in fact tell him. You know what? If I saw him again, I think I would be able to identify anytime. Anytime you're having a one photo lineup, you're getting into a problem. I understand that it's I think our cases all over that say it's unduly suggesting I understand if it's a photo of the particularly here, the guy's already indicted. I understand that, Your Honor. And I think maybe that's why I didn't write it down. Maybe I did right now. But keep that in my brief, Your Honor. But that's not the end of the inquiry. I mean, what you're doing, what he's doing is creating a problem for you. I understand that you need to get stuff written down and make sure that they have it in a timely manner. When did he show the photograph to her? It was, um, it wasn't when he initially talked to her. Is that no, it wasn't. It was during the trial preparation process. So you're saying what happened was the initial investigation. He just walked in and talked to her, didn't find much helpful. And he's just doing his sort of, I guess we call it preliminary trying to gather information. Exactly. And then later in trial prep, somebody had the idea that maybe ought to talk to her some more and see what she did. No, is that it's a common thing for trial prep. You go back to the same witnesses and you interview them more thoroughly just in case you missed anything. He didn't even realize that there had been a subsequent transaction involving ammunition. Whereas they're leaving the score as they're leaving the store, Ariel Underwood and the defendant, the defendant turns around and says, Oh, yeah, I'm gonna need some ammunition. He didn't. She, that's in the trial record. That's what's here. Correct. That's what she said. That's what you say in trial preparation. So how many, how long before the before the jury was struck to disoccur? Oh, it was, um, probably weeks, maybe a month. It was definitely long enough because I did submit a memorandum as to the admissibility of the 404 B evidence. Uh, so I don't know exactly off the top of my head when that was filed, but it certainly would have been. Well, it seemed to me that maybe you would have prepared and have the chronology straight before you walked in here today. Maybe. Don't you think so? Well, the fact is that the defendant was given notice of the 404 B evidence and he did have that fact. We know that fact, but we'll find out some facts this morning. We didn't know. And it seems to me it wouldn't be that difficult for you to anticipate. You might want to know the chronology. And I would think that you'd want to go. I second that. What exactly all the judge should said. But you got this suggestive one photo show up. You gotta get that on the record real quick and get to give the judge a shot at understanding that before you put the witness up there and have the witness finger the guy in the courtroom. Uh, because you gotta show you gotta be able to prove at some point if it's challenged in the question here's where they had a fair opportunity to challenge it or whether it's harmless there. But you gotta be able to prove that that court identification was not tainted. Correct. By the one photo should line up. I mean, they're much better off if they got six or eight photos there. Let me point out a couple of things. You're on here. You got one photo, one photo show up pre trial, right? That you didn't disclose. Well, you're on. I mean, actually, if anything's Brady, it probably is actually your honor. The first two witnesses filed by the United States on December 7th and December 14th did indicate that this witness would be testifying as to identification. But, you know, I don't necessarily want to pile on, but I just want to clarify this. So this one photo lineup was done for trial preparation. It was in the course of the discussion post indictment. It was. Yes, it was in the course of discussion that the agent had with the witness. And but but at the time it was perceived as a non issue because it was at best or at worst, I should say inconclusive. It wasn't a question of her recollection. Sure, it wasn't a question of her recollection. It was a question of the quality of but it was a picture of the defendant. That's what creates the problem under those cases. But suggestiveness is not the end of the inquiry. Wait one second. No, no, no. But I don't know. I agree with that. I don't think you're I don't think you respond to what my concern is. My concern is not. I'm not talking about the results of the one photo lineup. I'm talking about that the fact that it was done in trial prep. That seems to me that that's bothersome to me because one photo lineup is suggestive, but that was done in trial prep. Well, the agent wanted to find out if this witness would be able to identify the defendant as she said she would. I know that, but the agent works with the government agent is charged with knowing the law or you're faced with looking at the consequences. If the agent doesn't, I understand the agent is your age. I understand that. And you and you, he just does what he wants to do. Maybe that's true. And it tells you what he's done. Well, I don't listen. Listen, those government agents don't get they surely get training in in something about basic principles of the law, don't they? Miranda rights and and in photo lineups got to be pretty close to sort of standard instructions to agents, shouldn't it? I'm not a big fan of a single photo display. Well, you did it. I understand that. And let me ask you this. When did you find out it was done after it was done or before it was done? I found out, uh, basically it was right around the same time. Well, you know, I'm not appreciating him over. I don't think you answered that question. I don't. You might be able to skate this time. I don't know, depending on the question of if it was material, but that I don't know where the resolution would be if that issue was squarely in front of us. The improper out, of course, I don't if that had been raised by the other side, it's been raised lately about the improper out of court photo lineup. But gosh, that well, the that doesn't put that does not put the government's posture in a very good light, in my opinion. Of course. Now the objection actually made a trial was that it was cumulative. That was what? Cumulative. I know. And you said it was came with they said it was. They said it was. They didn't know all about it. You didn't give him a jinx accident. You didn't write it down. He says he didn't get the photo until the sentencing here. Well, you didn't want to say how would you? How would you give him the photo and tell him what happened? If it's a judge, figure it out. If it's a question of whether or not it's a Brady violation, I'm happy to address that. No, no, no, but the judge didn't get a chance to pass on it. I'm more concerned about the process here. Well, the defending did how we end up getting here. It's it should be a jinx act situation that that the agent wrote down his interview with this witness, which would include that picture. That picture I gave him. I gave her a one photo show up, and this is the guy that under indictment and lay it out there and let the judge decide whether it's proper or not. And then we witnessed the question. Do you think you'd recognize the person if you saw him again? At that point, the defense did object, and there was a sidebar, and the judge did hear the defense's argument and decided that if the basis for the objection was that it's cumulative, then I'm gonna let the inquiry proceed. Your point said the objection was cumulative. That was the objection. Once there was indication there had been some other attempted identification or something. Isn't that right? Well, your honor, I think it's I think it's pretty obvious to everybody that this witness that we just just look at the big picture for a second. She has interacted with this guy on two occasions. Miranda Cordery. She's the two different days. She's not the person that bought the gun, correct? She's the person that got the gun said he's the guy. Yes. Identification is not an issue. I mean, it's not a legitimate issue, and that's that's this might be the saving grace for you. It's not. You all are gonna get another case where you mess around with these one photo shot show ups and you're gonna bow something up. It's correct that I really don't think there was any real issue as to I. D. At that point, because Ariel Underwood, then why do you ask? We're in the courtroom. Is he here? You had this corduroy ID him in the courtroom as the person that she sold ammo to after showing her not a lineup, but a show up one photo post indictment in preparation for trials. All right, she was able to wait. You need to stop answering that him finishing. Then you may talk. Absolutely. Kind of talked away. That's fine. That's fine. Did you understand what I was getting at? Yes, Your Honor. Go ahead and say whatever you answer. How would you like because she had seen him and interacted with him before two different occasions, two different days. No, that's why you asked her to identify. I knew she would have an independent basis for her recollection, Your Honor. But the fact you wanted her to identify him makes it look much worse that that you showed him a picture of him before she got showed her a picture of him before they got in the courtroom. I thought you didn't write anything down. I'm sorry. I thought you didn't know if she would have an independent recollection of him. That's the reason you gave for why the agent was preparing her with that picture to see if she would have an independent recollection. We were taking a chance that she would recognize him. But I believe that she would have an independent recollection. Because if you look at the circumstances, she knew Ariel Wonderwood. They had worked together, and she had been trained on straw purchases. She was suspicious that this was the straw purchaser. Yes, they worked together to accomplish this thing, which is called a straw purchase. The actual buyer of the gun is the defendant. So she sees them on the 19th of February, when they first come in and try to buy the guns. Then she sees them again on the 27th of February, when they actually complete the transaction. It's on the 27th, where he turns around after the sale and says, Oh, by the way, we're gonna need some amine issue. She then has personal dialogue with this guy. They asked. She asked him questions, and he answers questions. All in all, that is good evidence for you. All that's good evidence for you. But all I'm trying to get at is how you potentially foul up that good evidence with a with a show up of a picture of him that you don't write down and provide to the defendant in a timely manner that you did a month before trial, and the defense doesn't find out about it until sentencing. Yeah. Well, the question is whether or not it's it's material to the case. Well, that's not the question. The question. Uh, the local rules up there require you to turn over jinx act material two weeks before the trial or something like that. Judge Cybert entered order to that effect in this case, and there should be jinx act material. I would think for something like this. There is a significant event in this case where you interview this woman who's gonna implicate this guy and all this ammunition and everything. Uh, I do understand, and nobody writes it down on the face of that. It just looks it's funny suspect. I do understand your concern, Your Honor. I can only say that the jinx issue is not for the court. And, uh, well, it's it's it's not before the court because you didn't write anything down. And you say you did God didn't even take notes, which doesn't make sense. I've never seen the FBI agents. I've worked with a lot of them, and they all take notes. Everything that they do, they got it written down somewhere, I think, and I can't speak for him. But I think his perception was that she did identify the guy. She was 90% sure that this was the guy. It wasn't a question. It was someone else. It was just a question of the quality of the photograph, and they're entitled to cross examined and witness about the prior events. You're correct. That might have some impact on what happened in the courtroom. You're correct. And which would be that show up with that one photo before she came in. You're showing a picture of the guy. You're correct, Your Honor. And she was 90% sure he did make effective use. He extensively cross examined the witness about this prior. He did do that. He stopped. He stumbled into it, as he said, because he had to stumble into it because nobody told him about. But under the rules, he's entitled to be told about. Correct. The way I read the local rules up there, but it did come out. He was able to use of it, and I think that because of that, it can't be shown that any that he can't meet the materiality element. You're arguing harmless error, basically. No, Your Honor. It's not. It is material. The cross examination of the witness. He's entitled to cross examine the witness on her prior statements about his client, and she made prior statements about his client to the officer. You say now a month or so before the trial in preparation, he was entitled to cross examine her fully and fairly with respect to those statements. And then he was not provided with them because you say there are no notes made of him and the agent didn't write anything down. Correct. Your Honor. May I respond to that? Absolutely. The standard for materiality is going to call into question whether or not this information, if disclosed, would have made a difference. It's standard for materiality. That's what I say. You're back to arguing harmless error. I'm arguing. I'm telling you that that there should be a jinx act statement, and it should have been turned over. And I think the ATF regulations require him to write that stuff down. There's three elements. I think they require him to take notes and preserve them. And then nothing was turned over. Your Honor. There's three elements for a Brady violation. I'm not talking about Brady. If I got there, I'd be very suspect of it, but I don't need to get there. There's a statutory violation. The Jinx Act requires the prior statements of a witness to be turned over before cross examination here under the local rules in West Virginia and northern West Virginia. They have to do it well before trial, and that's what Judge Cybert told y'all to do here. And he didn't have to turn it over here because you say nothing was written down. But there was definitely the prior statement made by the witness to the ATF agent. Why? Why do you? Why do you? You sort of got crosswise in your argument with the question. You were talking about a potential Brady violation, and I take it just to get to the bottom of this. You say even if you accept it's a sculptor Tori, do you think it's a sculptor Tori? Yes or no? Well, your and I'm not sure that it is because identification wasn't. It wasn't really an issue in this place. He identified himself on the beyond that. Then you say it's not a Brady violation, even if it is. It's sculptor Tori because this identification question isn't material because there was enough evidence on identification that it's just not material. So it doesn't make a Brady violation. Yes, you can't. Is that correct? Yes. Is that correct? Now, why do you say the jinx issue is not in front of us? It hasn't. It wasn't raised at any time. I can only brief and argue what was not made. No, Jenks issue was raised. No, Jenks issue. Jenks issue was raised. But when he was arraigned in Judge Cybert, they entered an order that ordered you to turn it over. You mean on appeal? Yes. No, no objection was preserved. Well, how do you? How can he say you didn't comply with jinx when you didn't turn anything over under jinx because you didn't make anything under jinx? I mean, that's a run. It's run dependent in circles. Do you say that because he found out, at least by the Senate scene before this appeal, that there was a statement that looked like jinx material? Well, now Jenks contemplates recorded statement. What's that? Jenks contemplates that the statement be recorded. Jenks includes notes of the officer. Correct. Uh, a FBI 302 or investigative report reflecting what the witness said. Uh, and you're representing to the court as an officer of this court that there's nothing in this case. None was ever made, which is, as I say, it's the fact that an A. T. F. Agent wouldn't in these circumstances is pretty astounding. I think it was an impromptu situation, your honor, where he just decided. And then he realized that the photo quality was really bad, and I think he didn't think much of that. But the fact that the witness was only 90% sure is a little different than her. That would be arguably impeaching. The fact that if he could have shown that he was only 90% sure what she showed them when they showed him a picture slightly, she's 100% sure in the courtroom. That's a little bit slightly margin. There's a prior. There's an inconsistency there. Slightly and marginally. Yes, your honor. But she did testify in the courtroom that the base for her recollection was his ear. But both of you seem to agree there was no question of his I d. Anyway, he was the right person. And in fact, the defense Underwood said that she confirmed all that. In fact, the defense himself, as Judge had pointed out, may respond, your honor. Oh, sure. In fact, in closing statement, the defense indicated that he wasn't contesting, uh, the issue of identification after he had hotly contested it throughout the trial. And and I could he said, and I quote, My client and I don't contest that. We're trying to sit here and tell you that it wasn't him in the video, and that wasn't him on the phone call. We don't even want to try and tell you that. I just wanted to make sure that you all knew that we're not trying to say that wasn't me with the big D on my hat. Your point is that it's harmless error if it's error. Correct. And my only point I'm making is I wish you all be careful about this kind of stuff. I've been on the other end of this argument, standing pretty much in the same courtroom. Uh, and there's no reason in the world for the government to risk a potential good case over something like this. I understand your concern. Thank you, Your Honor. Like Gillison. Your Honor. Just a couple matters of clarification. I don't want to take up much of your time. I appreciate you all listen to me today. Notice is a very important issue in front of the court. Appreciate you giving me the time and the pleasure of arguing this. Your Honor. Simple fact is that I did everything that I could humanly possibly do with the resources that I had at the district court level with. I don't know. Don't don't don't be apologizing for what you did or didn't do. Won't you just make your legal law? Okay. My legal argument is that I simply did not have this evidence. I did not have it. I did not have it. As the government has said, we didn't contest identification. I mean, my client was the one who was in the video. We already know that what we're talking about. Your Honor. Let me ask you this. When did you first find out? When did you first find out that Miss Cordray had been asked, had been shown off, had some other question and been shown a photo of your client at the photo that purported to be your client at the sentencing hearing that occurred two months after trial? What did you find out at trial when you cross examined her? Why do you ask? What was that discussion about? That discussion at trial was after she said that I was not sure about his identification. Then I asked her why not and why she was not. And she said what? And she said because she was not 100% certain at the time that she was interviewed that that was the person who was in the photograph. I did not have a photograph at that time. So you knew on cross examination that she had seen a photograph? I did, Your Honor. Well, did I miss ask you? I did. Did that raise concerns of an out of court lineup? It did. Did you raise that with the court? It did, but I didn't get the opportunity to raise it because the issue pre trial was not known to me. I did not know what you knew it. Then I did. And did you not say, Your Honor, bench conference? I did this. What is this? An out of court photo lineup? I don't know anything about. Did you say that, Your Honor? I didn't say that specific when you say, but I believe that the record shows that I did raise that issue initially with regards to the improper in court identification. And as the government has said is, as I will, improper in court in court identification. But but proper in improper in court identification has different components than out of court improper photo show show ups. That's two different issues. I agree with that, Your Honor. But you didn't raise. You said, Listen, you started. You got up and said, I did everything I could. Okay, I take it. Your word. I wonder now I'm asking you why didn't you when you found it on cross examination that that witness had been shown? It sounds like she's been shown a photo at some point. Why didn't you raise the objection? Say, Your Honor, what is this about a photo line? When did that happen? Why did they tell me about it? Your honors, I believe I did. You may not have went into those specifics, but I believe that I did mention the photo and the fact that it was and you find out before sentencing that the judge not require him to give you more information. Not after that. That's the main reason why I called the agent at the sentencing hearing, because I was trying to get testimony on this record for this court to be able to review it. Did you ask him questions like I asked about here? But did he have any notes or anything like I did, Your Honor? I asked him if he claims that I believe the record will show that he claims that there was an interview and a report that was done. But in the report that was actually done, there was no mention whatsoever as to about the lack of identification or or the lack of uncertainty about the photo. I got a photo being shown. Nothing at all. Your honor. There was a report. You ever see the report? I saw one report. I saw the initial report and I also asked on cross examination. Um, one of the issues that was raised below is whether or not this report could be admissible. And that's a sidebar that the photo ID photo lineup show what was done at the first interview. Do you have any reason to think that? That's what I believe, Your Honor, with all due respect. But I know that that was not provided to me to where I could have addressed that issue pre trial or even doing it. You understand there was a second interview close to the trial when there was a photo show up. I believe I did find out some information with regards to that, but I did not find out about the second interview until the sentencing hearing. And that was when I was able to find out that the government agent had knowledge that she was not able to identify it. So therefore, that knowledge of that from her testimony, you said I did, Your Honor. But I didn't know the extent of what I didn't know is I didn't know when she had told somebody else about it. I didn't know when I didn't know if she had told someone about it, said the judge stamp. Clearly, there's been a photo line up outside of this Your Honor, I cannot say that I used that definite language. I can only tell the court that with regards to preserving that objection, I believe that I did the best objection that I had at that time available to me based upon the information that I had. I think each and every one of you are very much for my time. We thank you very much. You're court appointed. Yes, sir. I am. But we appreciate the work that you and all the court appointed lawyers do. Thank you very much. We'll come down in Greek Council in adjourn court. Sonny die. This honorable court stands adjourned. Sign a die. God save the United States. This honorable court.
judges: Robert B. King, Dennis W. Shedd, Stephanie D. Thacker